# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

MANFRED BERNIER,

|                              |        |
|------------------------------|--------|
| Plaintiff, | |

v.                                               9:17-CV-1376
                                                (LEK/ATB)

THOMAS CARTER, et al.,

Defendants.

---

MANFRED BERNIER, Plaintiff, pro se
CARL G. EURENIUS, Asst U.S. Attorney for Defendants Carter, King, Langford, and
Burdo

ANDREW T. BAXTER, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

This matter was referred to me for Report and Recommendation, pursuant to 28

U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).  Plaintiff brings this action pursuant

to *Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 388 (1971), alleging that

defendants violated his constitutional right to adequate medical care. (Complaint

("Compl.")) (Dkt. No. 1).  Presently before the court is the represented[1] defendants'

motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) or in the alternative for summary

---

[1] Defendant Mr. Dickson (Joshua Dickson) has never been served.  On July 1, 2019 defense counsel wrote a letter to the court, stating, inter alia, that some of the defendants who were former Bureau of Prisons ("BOP") employees had been located, but the attempt to locate defendant Dickson failed. (Dkt. No. 25).  A letter and a copy of the complaint were sent to defendant Dickson at the last address that the BOP had on file, but they were returned as "undeliverable/unable to forward." (*Id.*) The lack of a current address for defendant Dickson was confirmed in a follow-up letter, dated July 15, 2019. (Dkt. No. 27).  Plaintiff was notified by Text Order, dated July 26, 2019, that he would be responsible for locating this defendant and identifying the "Doe" defendants. (Dkt. No. 28).

judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 38, 39, 41).[2]  Plaintiff has responded in opposition to the motion and has requested further discovery pursuant to Fed. R. Civ. P. 56(d). (Dkt. No. 42).

I.    **Facts**

Plaintiff claims that at approximately 1:00 a.m. on November 19, 2015, while incarcerated at Ray Brook Federal Correctional Institution ("FCI Ray Brook"), he woke to excruciating, stabbing abdominal pain. (Compl. ¶ 11).  Plaintiff claims that the pain was so intense that he vomited numerous times and collapsed to the floor. (Compl. ¶ 12).  Plaintiff states that the cells at FCI Ray Brook were not equipped with emergency medical alert buttons, so he cried out to his cell-mate, asking him to try to get the attention of an officer in the housing unit. (Compl. ¶ 13).  Plaintiff states that his cell-mate began screaming for help "under the door space of the solid door." (*Id.*)

Plaintiff states that he cell was located on the "B-side of a 2 sided housing unit." (Compl. ¶ 14).  The officer, who was stationed on the A-side of the unit only made rounds every two hours. (*Id.*)  Plaintiff states that defendant Dickson arrived one half hour after plaintiff's cell-mate began yelling for help.  Defendant Dickson told plaintiff he could not unlock his cell door or call for medical assistance on the overnight shift because "only a lieutenant can make that call." (*Id.*)

Defendant Dickson called a lieutenant, but it took another thirty minutes for defendant Lieutenant Carter to arrive. (Compl. ¶ 15).  Plaintiff states that defendant

---

[2] Defense counsel made the motion at Dkt. No. 38.  Plaintiff's medical records were filed in a separate document as Exhibit A and Bates-Stamped in the lower right hand corner of the document. (Dkt. No. 39).  An amended memorandum of law and amended statement of material facts were filed at Dkt. No. 41).

Carter arrived with defendant Officer King. (Compl. ¶ 16).  Plaintiff alleges that defendant Carter began to "bark" at plaintiff through the door and told plaintiff that he had "better not be faking" or he would charge him with a disciplinary rule violation. (*Id.*)  Plaintiff claims that defendant Carter made various disparaging remarks about plaintiff's condition and told plaintiff to "man up." (*Id.*)  Plaintiff told defendant Carter that he needed medical help, "a nurse, an ambulance, somebody." (*Id.*)  Plaintiff claims that the other officers[3] simply watched as defendant Carter made fun of the plaintiff. (Compl. ¶ 17).  Plaintiff claims that the other two officers were "smirking and amused" by defendant Carter's conduct. (*Id.*)

Defendant Carter allegedly told plaintiff that he could sign up for sick-call in the morning, but that he had better not call for help again, "'because if you make me return, there's going to be consequences.'" (Compl. ¶ 19).  Plaintiff states that defendant Carter then left plaintiff in pain, without alerting any medical personnel. (*Id.*)  Sick-call was not for another five hours. (Compl. ¶ 20).  Plaintiff states that he spent the next five hours moaning, writhing, vomiting, grimacing, and groaning, in the worst pain he had ever experienced. (Compl. ¶ 21).  Plaintiff states that defendants King and Dickson made "a couple more" rounds that night, but all they did was "gawk" at plaintiff. (*Id.*)

Plaintiff states that, in the morning, he immediately notified the officer on duty of his emergency. (Compl. ¶ 22).  The officer called the medical clinic, plaintiff was seen by a nurse, who realized the urgency and called an ambulance. (*Id.*)  Plaintiff claims

---

[3] The court assumes that plaintiff is referring to defendants Dickson and King.

that when he arrived at the hospital, he was diagnosed with a "burst appendix"[4] and was immediately taken into surgery. (*Id.*)  Plaintiff then states that the surgery "revealed" that he had suffered from a "strangulation of intestines, an internal hernia, and a tumor which had to be removed." (Compl. ¶ 23).  Plaintiff was returned to the facility and had a follow-up appointment two days later, at which time his surgeon's findings were discussed with him. (*Id.*)

Plaintiff claims that defendant Carter was deliberately indifferent to plaintiff's serious medical needs in violation of the Eighth Amendment. (Compl. ¶ 26). Specifically, plaintiff claims that defendant Carter (1) refused to call for help and delayed plaintiff's medical care, leaving him to "languish" in pain for five hours until he was seen by a nurse in the morning (Compl. ¶¶ 26, 28); and (2) harassed and "menaced" plaintiff verbally, causing plaintiff to suffer trauma and distrust of prison officials (Compl. ¶ 27).

Plaintiff claims that defendant King and Dickson were deliberately indifferent to plaintiff's serious medical needs when they witnessed defendant Carter's unconstitutional conduct and failed to intervene or call for medical help. (Compl. ¶¶ 29, 30).  Plaintiff claims that defendants Warden Langford and Health Services Administrator ("HSA") Ms. Burdt[5] were deliberately indifferent to plaintiff's serious medical needs because they "failed to correct, allowed to continue, and even endorsed" a "policy of no emergency buttons in the cells, no medical care available overnight,

---

[4] As discussed below, the medical records do not show that plaintiff's appendix had "burst."

[5] It has been determined that the HSA's name is "Burdo," not "Burdt," and the court will refer to defendant HSA Burdo for the remainder of this decision.

4

staff rounds only every two hours overnight, and sole discretion left to unprofessional security staff whether to call for an ambulance . . . ."[6] (Compl. ¶¶ 31, 32).  Plaintiff seeks declaratory, injunctive, and substantial monetary relief. (Compl.    ¶¶ 36-39).

## II.    **Motion to Dismiss/Motion for Summary Judgment**

### A.    **Motion to Dismiss**

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp*., 550 U.S. at 555).

When considering a motion to dismiss pursuant to Rule 12(b)(6), the court's consideration is limited to the factual allegations as stated in the complaint, documents attached to the complaint as exhibits or incorporated into the complaint by reference, and matters of which the court can take judicial notice.  *Portillo v. Webb*, No. 16 Civ. 4731 (VEC/GWG), 2017 WL 4570374, at *1 (S.D.N.Y. Oct. 11, 2017) (quoting *Brass v. Am. Film Tech*., 987 F.2d 142, 150 (2d Cir. 1993) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991)).  A court may take judicial notice of a public record pursuant to Fed. R. Evid. 201(b).  *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000).

---

[6] Plaintiff makes the same claims against two John Doe defendants: the Deputy of Administration and the Captain of Security. (Compl. ¶¶ 33, 34).  Neither of these individuals have been identified or served.

**B.    Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## III.    Exhaustion of Administrative Remedies

### A.    Legal Standards

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action.  The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim.  *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (*abrogated by Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1857 (June 6, 2016)) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings.  *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).  As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements.  *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable grievance procedure.  *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite

to bringing suit in federal court.  548 U.S. at 90-103.

The BOP procedural rules provide for a four-step administrative grievance system for inmates to use. *Robinson v. Knibbs*, No. 16-CV-3826, 2019 WL 2578240, at *4 (S.D.N.Y. June 24, 2019).  First, the inmate must present the issue "informally" to prison staff by way of a BP-8 form. *Id.* (citing 28 C.F.R. § 542.13(a)).  The BP-8 provides that the inmate must identify the specific issue that requires resolution, and that the issue be explained in detail. *Id.* (citing 28 C.F.R. § 542.14(c)).  If the informal resolution is unsuccessful, the inmate may submit a "'formal written Administrative Remedy Request,'" known as a BP-9 to the staff member who is designated to receive such requests. *Id.* (citing 28 C.F.R. § 542.14); 28 C.F.R. § 542.14(c)(4).  The BP-9 also requires that the inmate identify the issues that require resolution. *Id*.

An inmate may appeal the Warden's response to the BP-9 to the Regional Director on a BP-10 form. *Id.* (citing 20 C.F.R. § 542.15).  Finally, if the inmate is unhappy with the Regional Director's response, he may file a Central Office Administrative Remedy Appeal ("BP-11") with the BOP's General Counsel. *Id.* (citing 20 C.F.R. § 542.15).  Both the BP-10 form and the BP-11 forms direct the inmate to identify the reasons for his appeal. *Id.* (citing 20 C.F.R. § 542.15(b)).  The Second Circuit has held that the inmate must provide enough information about the conduct of which he complains so that the prison officials may take appropriate responsive measures. *Id.* (citing *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006)).

### B.    Application

Defendants concede that plaintiff filed all the appropriate forms to appeal his

grievance to the highest level.  On April 5, 2018, plaintiff filed his grievance documents in support of this federal complaint.[7] (Dkt. No. 7).  However, defendants argue that plaintiff only made one claim in his grievance.  That claim was that defendant Carter acted unprofessionally in refusing to get medical assistance for the plaintiff on November 19, 2015.  Defendants argue that plaintiff did not mention any other corrections officers, did not complain about the lack of "emergency buttons" in the cells, nor did he complain of inadequate night-time staffing or procedures for making rounds during the night.  Thus, defendants argue that plaintiff's claims against the additional officers/supervisory officials, and his other new claims, are unexhausted and must be dismissed on that basis.

When a plaintiff fails to fairly raise his claims in the grievance, those claims are not exhausted because the inmate must afford corrections officials the time and opportunity to address complaints internally. *Demuth v. White*, No. 9:18-CV-915, 2020 WL 1030649, at *4 (N.D.N.Y. Mar. 3, 2020) (citing *Beckles v. Bennett*, No. 05 Civ. 2000, 2008 WL 821827, at *13 (S.D.N.Y. Mar. 26, 2008) (citing *Porter*, 534 U.S. at 524–25)). Plaintiff is not required to name all responsible parties in a grievance in order to exhaust his claims when he is making a claim against a group of individuals who participated in the same conduct. *See Albritton v. Morris*, No. 13-CV-3708, 2018 WL 1609526, at *10-11 (S.D.N.Y. Mar. 29, 2018) (citing *Espinal v. Goord*, 558 F.3d 119, 126 (2d Cir. 2009) (the New York State grievance procedure does not contain an identification requirement)).  Plaintiff must "provide 'a specific description of the

---

[7] The defendants have not included plaintiff's grievance documents as an exhibit to their motion.

problem,' that was sufficient to 'alert the prison to the nature of the wrong for which redress was sought,' and provide 'sufficient notice of wrongdoing to cause them to investigate any such claim.' " *Id*. (quoting *Espinal*, 558 F.3d at 127-28).  The issue is whether plaintiff's grievance alerted the prison officials to the conduct of "other" officers or to the new claims that plaintiff brings with respect to emergency buttons and/or night time staffing.

### 1.    Other Individual Officers

A review of plaintiff's initial grievance shows that he made allegations of "unprofessional" and harassing behavior specifically against defendant Carter.  In his grievance, plaintiff mentioned only that other "staff" alerted defendant Carter to the medical emergency.[8] (Dkt. No. 7 at 5).  However, plaintiff did give a description of the incident, specific enough to allow the prison officials to investigate whether Carter and potentially other staff members engaged in the allegedly unconstitutional behavior. Although the court will find that the plaintiff's remedies have been exhausted with respect to defendants Carter, King, and Dickson, the court will recommend dismissal as against defendants King and Dickson for other reasons, discussed below.

### 2.    New Claims

Plaintiff's new claims about the emergency alert buttons and the night-time staffing are different from his grievance, which never alleged that there was any trouble alerting the officers to his condition.  He claimed only that defendant Carter did not

---

[8] Plaintiff has now named defendants King and Dickson as involved in Carter's allegedly unconstitutional conduct.  Defendant Dickson was the first officer on the scene, who presumably was the officer who alerted Carter, and defendant King allegedly arrived with defendant Carter. (Compl. ¶¶ 14, 16).

afford plaintiff immediate care, and acted unprofessionally, forcing plaintiff to wait in agony for five hours until sick call the following morning. It is unlikely that the prison officials would have been alerted either to plaintiff's new claims of the lack of emergency alert buttons or his claim that there were insufficient corrections officers on duty to properly respond to his medical emergency.

A claim may be exhausted when it is "closely associated with, but not explicitly mentioned in the exhausted grievance. *Hilbert v. Fischer*, No. 12 Civ. 3843, 2013 WL 4774731, at *4 (S.D.N.Y. Sept. 5, 2013). The grievance need not "'explicitly discuss the misconduct . . . alleged in the complaint,' so long as the claim was specifically addressed in the prison's denial of the grievance." *Albritton*, 2018 WL 1609526, at *11 (quoting *Espinal*, 558 F.3d at 128) (citing *Percinthe v. Julien*, No. 08-CV-893, 2009 WL 2223070, at *4 (S.D.N.Y. July 24, 2009) ("[A] claim may be exhausted when it is closely associated with, but not explicitly mentioned in, an exhausted grievance, as long as the claim was specifically addressed in the prison's denial of the grievance and, hence, was properly investigated.").

In this case, plaintiff never mentioned any facts relating to these two newly asserted claims. Although the grievance denial and the responses to plaintiff's appeal were very vague, it is clear that the only investigation that was conducted by the prison officials related to defendant Carter's allegedly unprofessional conduct. On June 7, 2016, the Acting Regional Director responded to plaintiff's first appeal by stating that

> You appeal the response from the Warden at FCI Ray Brook
> and allege that a staff member acted in an unprofessional
> manner towards you by cursing at you and threatening you
> during your medical emergency. You request a complete and

11

thorough review of this matter.

(Dkt. No. 7 at 3). The notice further informed plaintiff that although the matter had been investigated, the results would not be disclosed to the plaintiff, because he was not entitled to the information. (*Id.*)

Plaintiff appealed and argued that he should be informed of the results of the investigation. On August 25, 2016, the Central Office Administrative Remedy response repeated that plaintiff's grievance involved "a lieutenant at FCI Ray Brook [who] acted unprofessionally and egregious [sic] toward you during a medical emergency." (Dkt. No. 7 at 4). The Central Office notice reassured plaintiff that a "thorough review will be conducted and proper action will be taken as deemed necessary."[9] (*Id.*) The notice also stated that plaintiff had "no entitlements to be notified of the investigation or any administrative action, if any, taken against staff." (*Id.*) It is clear that no other issues were raised or investigated. Thus, plaintiff has failed to exhaust his claims that his constitutional rights were violated because there were no emergency alert buttons in the cells and that there were insufficient officers on duty at night to handle medical emergencies. Those two claims may be dismissed as unexhausted.

## IV.    **Personal Involvement**

### A.    **Legal Standards**

The "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983[,]" and supervisory officials may

---

[9] It is unclear what was meant by the statement that a review "will" be conducted. The response to plaintiff's previous appeal stated that the thorough review "was" conducted. (Dkt. No. 7 at 3).

not be held liable merely because they held a position of authority. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted); *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). The requirement of personal involvement applies to *Bivens* actions. *Gottesfeld v. Anderson*, No. 18 Civ. 10836, 2020 WL 1082590, at *10 (S.D.N.Y. Mar. 6, 2020) (citations omitted). A defendant may be considered "personally involved" if

> (1) the defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).[10]

---

[10]Many courts in this Circuit have discussed whether all of the personal involvement factors, set forth in *Colon*, are still viable after *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). See, e.g., *Conklin v. County of Suffolk*, 859 F.Supp.2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon*. *Id*. In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.'" *Id*. (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y.2011)). *See also Young v. Choinski*, 15 F. Supp. 3d 172, No. 3:10–CV–606, 2014 WL 962237, at *10–12 (D. Conn. Mar. 13, 2014) ("Although *Iqbal* does arguably cast doubt on the viability of certain categories of supervisory liability, where the Second Circuit has not revisited the criteria for supervisory liability, this Court will continue to recognize and apply the *Colon* factors.").

**B.    Application**

**1.    Defendants Langford and Burdo**

In this case, plaintiff included FCI Warden Stephen Langford and HSA Burdo as defendants.  Plaintiff does not claim that either of these defendants were present during, or otherwise personally involved in plaintiff's medical emergency on November 19, 2015.  To the extent that plaintiff names defendants Langford and Burdo because they are defendant Carter's supervisors, any medical care claim against them may be dismissed.

To the extent that plaintiff is suing Warden Langford and HSA Burdo because there were no duress alarms in the cells and there was inadequate staffing at night, those claims are unexhausted and consequently should be dismissed as against these defendants even assuming that they were "personally involved in," or responsible for, such decisions.[11]

**2.    Defendant King**

Plaintiff has named "C.O. [Lucas] King" as a defendant in this action.  Plaintiff alleges that defendant King arrived with defendant Carter and failed to "intervene" when defendant Carter refused to call for immediate medical assistance for plaintiff.

Defendant King has filed an sworn declaration in support of the motion for summary judgment.[12] (Dkt. No. 38-2) ("King Decl.")  In the declaration, defendant

---

[11] Defendants also argue that the issue of duress alarms and staffing may not be brought as *Bivens* claims based upon *Ziglar v. Abassi*, __ U.S. __, 137 S. St. 1843, 1857 (2017), an argument that I will address below.

[12] To the extent that the court considers an affidavit, it must do so in the context of summary judgment.

King asserts that he does not know the plaintiff, and on the date and time of plaintiff's medical emergency, defendant King was not on duty at FCI Ray Brook. Defendant King states that his daily assignment on November 19, 2015 was to work the A/M2 shift (6:15-14:15) in the Mohawk B housing unit. (King. Decl. ¶ 4 & Ex. A). Defendant King specifically states "I did not enter the institution prior to the start of my schedule shift." (*Id.*)

In plaintiff's response to the defendants' motion for summary judgment, he claims that he needs additional discovery to show that defendant King was present with defendant Carter at the time of plaintiff's medical emergency. (Pl.'s Fed. R. Civ. P. 56(d) Affidavit ¶¶ 1, 4) (Dkt. No. 42). Plaintiff states that he wishes to obtain "camera footage" and "overtime records," speculating that even though defendant King's "regular" shift did not start until the morning, he must have been working overtime in plaintiff's housing area. (Pl.'s Response to Def.s' Statement of Material Facts ¶ 32). However, defendant King's Declaration specifically states that he did not "enter the institution" prior to the start of his regularly scheduled shift. This, coupled with the fact that plaintiff never mentioned King in his grievance as having been involved in defendant Carter's alleged conduct leads the court to deny plaintiff's request for additional discovery of "overtime records" or "video evidence" from 2015 prior to ruling on the defendants' motion. Defendant King has shown by affidavit and facility records that the was not in the facility at the time of plaintiff's medical emergency. Thus, he was not personally involved in any alleged denial of medical care, and the complaint may be dismissed as to defendant King.

## V.    Availability of *Bivens* Remedy

### A.    Legal Standards

In *Bivens*, the Supreme Court held that a damage claim could be asserted against federal officials for constitutional violations, even absent statutory authorization,[13] because such a remedy could be judicially implied under the Constitution. *See Bivens*, 403 U.S. at 399 (Harlan, J., concurring).   *Bivens* involved an individual who sued unnamed narcotics officers under the Fourth Amendment when they handcuffed him in his home without a warrant. 403 U.S. at 397.   After *Bivens*, the Supreme Court has recognized only two other contexts for *Bivens* remedies.   The first was a case of sex discrimination brought by a federal employee under the due process clause of the Fifth Amendment. *See Davis v. Passman*, 442 U.S. 228 (1979).   The second was a case in which the plaintiff alleged that prison officials' failure to treat an inmate's asthma led to his death in violation of the Eighth Amendment. *See Carlson v. Green*, 446 U.S. 14 (1980).

In *Ziglar v. Abassi*, 137 S. Ct. at 1855, the Supreme Court stated that *Bivens*, *Davis*, and *Carlson* were the only instances in which the Court has approved of an implied damage remedy under the Constitution, and the court cautioned against creating additional implied remedies as a matter of course.   Expanding the *Bivens* remedy is a "disfavored judicial activity." *Id.* at 1857.   In *Ziglar*, the court developed a two-step analysis to determine whether a *Bivens* remedy may be implied in a particular situation.

---

[13] *Bivens* is the counterpart to 42 U.S.C. § 1983 which provides the statutory authorization for damage liability, resulting from constitutional violations committed by defendants acting under color of state law.

16

*Id.* at 59-60.  The court must first analyze whether "the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Id.* at 1859.  The factors relevant to this analysis include:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860.  If the case does not present a new *Bivens* context, then a claim for relief under *Bivens* is not precluded, and the court may proceed to consider the merits of the claim.  If the case does present a new context, then the court must consider whether there are "special factors counseling hesitation in the absence of affirmative action by Congress." *Id.* at 1857 (internal quotation marks and citations omitted).

## B.    Application

Defendants argue that plaintiff's claim that the supervisory defendants should have installed duress alarms in the cells at Ray Brook, that they should have put more staff on duty during the night, and that the staff should make rounds more frequently, is barred by the *Abassi* analysis.  It is arguable that defendants are correct.  The determination of whether to put duress alarms in each inmate's cell and how much staff to have on duty over night appears to go beyond the three types of actions allowed under *Bivens*, even though plaintiff argues that the issues are related to his medical care claim.  Thus, implying a damage remedy for these claims could present a "new context"

17

pursuant to *Abassi*.  The cases generally brought under *Bivens* are against the officer or officers who were personally involved in the alleged excessive force or denial of medical care. *See Lehal v. Central Falls Detention Facility Corp.*, No. 13-CV-3923, 2019 WL 1447261 at *12 (S.D.N.Y. Mar. 15, 2019) (citing cases in which *Bivens* claim allowed).  However, the claims in this case against the Warden and HSA Burdo involve policy and staffing considerations that are not directly related to the medical care afforded to the plaintiff.

Assuming that suing these supervisory officials under *Bivens* would be considered a "new context," there are also "special factors" which counsel against inferring a damage remedy for the claims asserted against the Warden and HSA.  In *Ojo v. United States*, 364 F. Supp. 3d 163, 175 (E.D.N.Y. 2019) (citations omitted), the court held that *Bivens* has never been the appropriate vehicle for altering an entity's policy.  Here, plaintiff alleges that the failure to place duress alarms in all of the facility's cells, allowed the constitutional violations to occur.  Any determination of this issue would involve "'inquiry and discovery into the whole course of the discussions and deliberations that led to the policies.'" *Id.* (quoting *Ziglar*, 137 S. Ct. at 1860-61). The "policy" to which plaintiff objects in this case would involve examination of "prison administration and resource allocation."  The court in *Ojo* found that such claims would "require additional pause." *Id.*  Thus, the special factors, implicated by the plaintiff's policy claim regarding duress alarms and staffing weigh against implying a damage remedy under *Bivens* for these claims.

The court does not need to make a definitive ruling on this issue because, even if

the court were to find that a *Bivens* remedy were available, the claim against the Warden and HSA Burdo could not succeed.[14]  Plaintiff's Eighth Amendment medical care claim states that defendant Carter deliberately delayed plaintiff's medical care. Neither the Warden, nor HSA Burdo had any personal involvement in that claim. Plaintiff's cell-mate was able to call for help.  Defendant Carter's alleged conduct would not have been affected by either a duress alarm or additional staffing, and neither alarms, nor staffing would have prevented defendant Carter from allegedly telling plaintiff that he was going to have to wait for sick call in the morning.  Thus, plaintiff's claims may be dismissed as against the Warden and HSA Burdo.[15]

## VII.  Medical Care

### A.    Legal Standards

The standard for medical treatment under *Bivens* is the same as that used in cases brought under 42 U.S.C. § 1983. *See Gonzalez v. Hasty*, 802 F.2d 212, 221 (2d Cir. 2015) (applying section 1983 standard to *Bivens* action).  In order to state a claim based

---

[14] As stated above, plaintiff never raised the issues of duress alarms or staffing when he pursued his administrative remedies, and so did not exhaust these claims.

[15] The court notes that as the Health Services Administrator, defendant Burdo presumably would not have any involvement in staffing or in any decision to equip cells with duress alarms.  The court also notes that plaintiff has been transferred out of FCI Ray Brook, rendering moot any claims for injunctive relief. *See Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (An inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officers at that facility).  In his response to the defendants' motion, plaintiff now alleges that the Warden and HSA Burdo violated the Federal BOP Program Statement 1600.13, ¶ 21 "(entitled: 'Duress Alarm Systems'"). (Dkt. No. 42 at 4).  However, "a claim that the BOP or one of its employees violated such an internal regulation or policy fails to rise to a level of constitutional significance and is not cognizable under *Bivens*." *Thompson v. Sadowski*, No. 9:09-CV-685, 2011 WL 7640125, at *9 n.9 (N.D.N.Y. Aug. 16, 2011) (citations omitted), *Rep't-Rec. adopted*, 2012 WL 1033674 (N.D.N.Y. Mar. 27, 2012).

on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  There are two elements to the deliberate indifference standard.  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind.  *Id.* at 184 (citing *inter alia Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

### 1.    Objective Element

There is a two part inquiry to determine whether an alleged deprivation is "objectively serious."  *Benjamin v. Pillai,* 794 F. App'x 8, 11 (2d Cir. 2019) (citing *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)).  The first question is whether the plaintiff was actually deprived of adequate medical care.  *Id.*  Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care."  *Salahuddin*, 467 F.3d at 279-80 (citing *Farmer v. Brennan*, 511 U.S. 825, 844-47 (1994)).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious."  *Benjamin v. Pillai*, 794 F. App'x at 11 (citing *Salahuddin*, 467 F.3d at 280).  The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff.  *Salahuddin*, 467 F.3d at 280 (citing *Helling v. McKinney*, 509 U.S. 25, 32–33 (1993)).  If the

20

"unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith*, 316 F.3d at 185-86). However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Benjamin v. Pillai*, 794 F. App'x at 11. The court in *Benjamin* reiterated that although courts speak of a "serious medical condition" as the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Benjamin*, 794 F. App'x at 11 (citing *Smith* 316 F.3d at 185).

### 2.    Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Benjamin*, *supra* at 11 (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 835-37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition, that the charged official possessed "'a state of mind that is the equivalent of criminal recklessness.'" *Benjamin, supra*, (quoting Hathaway, 99 F.3d at 553).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Abreu v. Lipka,* 778 F. App'x 28, 32 (2d Cir. 2019) (quoting *Smith,* 316 F.3d at 184). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer*, 511 U.S. at 837). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844. The court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Riddick v. Maurer,* 730 F. App'x 34, 38 (2d Cir. 2018) (quoting *Chance*, 143 F.3d at 703). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Because plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id.; see also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (noting that negligence is not actionable under § 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under § 1983.

## B.    Application

In this case, plaintiff alleges that defendant Carter intentionally left him for several hours in excruciating pain, rather than calling for medical help or for an ambulance immediately to take plaintiff to the hospital.[16] According to the standards outlined above, in cases where plaintiff alleges unreasonable delay or interruption of ongoing treatment, the court looks to "'the severity of the temporary deprivation alleged by the prisoner,'" not "'the severity of the prisoner's underlying medical condition.'" *Gist v. Sommer*, No. 14-CV-6736, 2020 WL 905689, at *6 (S.D.N.Y. Feb. 24, 2020) (quoting *Smith v. Carpenter*, 316 F.3d at 186).

Defendants argue that plaintiff's Eighth Amendment claim against defendant Carter should be dismissed. In support of their argument, they have filed plaintiff's medical records, showing that he was taken to the hospital and underwent emergency

---

[16] To the extent that plaintiff is alleging that defendant Carter's unprofessional behavior or verbal harassment rose to the level of a constitutional violation, any such claim must fail. Verbal harassment, without injury, no matter how unprofessional and inappropriate it may be does not rise to the level of a constitutional violation. *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (per curiam).

surgery the next day for "lysis of adhesions, an internal hernia, and a resection of a mesenteric tumor. (Dkt. No. 39 at ROOT00015). Defendants cite cases holding that an inmate's belief that something "more should have been done to treat him" is not a sufficient basis for an Eighth Amendment claim, and that such claims are reserved for situations in which "officials deliberately delayed care as a form of punishment . . . ." (Def.s' Mem. at 14) (citing cases).

Plaintiff is not alleging malpractice or that "something more should have been done to treat" his problem. He is not alleging disagreement with the actual medical treatment he received, nor is he claiming medical malpractice. He is alleging that the defendant deliberately delayed care, perhaps not as a form of punishment, but in a mean-spirited fashion. Although as stated above, defendant Carter's allegedly unprofessional and harassing language, in and of itself, does not rise to the level of a constitutional claim, his statements could show that he was intentionally denying plaintiff immediate care when it was clear that plaintiff was in extreme pain. The fact that plaintiff was ultimately taken to the hospital and underwent emergency surgery supports plaintiff's claim that he was suffering from the pain that he claims.[17]

Defendants have submitted only plaintiff's medical records. These do not establish that there is no genuine issue of material fact with respect to defendant Carter's conduct. There is no affidavit from defendant Carter, and thus, plaintiff's

---

[17] The court does note that upon plaintiff's admission to the hospital, his "Initial History and Physical" states that although he did wake up with pain, he had several episodes of nausea, but did not vomit. (Dkt. No. 39 at ROOT00062). This is admittedly contrary to plaintiff's description of the incident, in which he states that he vomited several times. (Compl. ¶ 12). The medical document also states that at the time of the examination, plaintiff was "in no acute distress." (Dkt. No. 39 at ROOT00062). Whether plaintiff's pain had subsided by the time that he arrived at the hospital does not resolve the question of whether defendant Carter ignored plaintiff's condition several hours before. While this may ultimately affect plaintiff's credibility, the question of fact remains.

factual assertions about what happened on the night in question are not rebutted.  In *Archer v. Dutcher*, 733 F.2d 14, 16 (2d Cir. 1984), the Second Circuit held that "if defendants did decide to delay emergency medical aid-even for 'only' five hours-in order to make Archer suffer, surely a claim would be stated under *Estelle*."  The five to six hour delay was not the only important or determinative fact in *Archer*, there was also the "seriousness of the plaintiff's condition, the extent of [Archer's] suffering, and the defendants' desire to cause the plaintiff to suffer" which all led to the Second Circuit's decision. *See Davidson v. Harris*, 960 F. Supp. 644, 649 (W.D.N.Y. 1997).

In this case, plaintiff has alleged extreme pain and a deliberate decision by defendant Carter to disregard plaintiff's condition and leave him to suffer until the morning when the nurse realized the emergency and sent plaintiff to the hospital.  The medical records support plaintiff's claim that he had a condition that required surgery.  There is a question of fact as to whether defendant Carter knew of and disregarded plaintiff's serious medical condition.  Thus, the court can neither recommend granting a motion to dismiss nor one for summary judgment at this time on this issue.

## VIII. <u>Failure to Serve</u>

### A. **Legal Standards**

Federal Rule of Civil Procedure 4(m) requires that a complaint be served upon a defendant within 90 days of filing. Fed. R. Civ. P. 4(m).  The court may dismiss an action as against a defendant who is not served within the time limit, after notice to the plaintiff. *See Walker v. Martuscello*, No. 9:18-CV-1189, 2020 WL 132313, at *1 (N.D.N.Y. Jan. 13, 2020).

## B.    Application

In this case, defendant Dickson and two John Doe defendants have never been served.  The two "Doe" defendants have never been identified.  Defendant Dickson no longer works for the BOP. (Dkt. No. 27).  Defense counsel has attempted to ascertain defendant Dickson's current address, but has been unable to do so. (Dkt. Nos. 27, 28). On July 26, 2019, this court issued a text order, informing plaintiff that he must seek discovery from the defendants regarding identification and service on the John Doe defendants and Mr. Dickson. (Dkt. No. 28).  Clearly, no further discovery is available from defendants regarding Mr. Dickson.  The BOP does not have a current address for Mr. Dickson.  Plaintiff knew about this, shortly after the first attempt at service was made. (Dkt. No. 15 at 3).  Plaintiff was also served with defense counsel's status updates regarding the attempts at locating the defendants, some of whom were located and for whom service was accepted. (Dkt. Nos. 25, 27).  Thus, plaintiff is well aware that defendant Dickson has not been found.  As stated above, plaintiff was informed on June 26, 2019 that further action was his responsibility. (Dkt. No. 28).  Because plaintiff is pro se, this court will not recommend dismissing defendant Dickson for failure to serve at this time, but plaintiff is hereby notified that dismissal is also warranted under Fed. R. Civ. P. 4(m) for failure to serve defendant Dickson.

Defense counsel officially appeared for the remaining defendants on September 25, 2019.[18] (Dkt. No. 34).  Plaintiff has "identified" the John Doe defendants as the "Deputy of Administration" and the "Captain of Security." (Compl. ¶¶ 9, 10). These

---

[18] Defense counsel was involved in this action prior to filing his "Notice of Appearance" because the court ordered counsel to assist in locating the defendants for service.

individuals are supervisory defendants, who have been sued only in that capacity. (Compl. ¶¶ 33, 34). However, plaintiff's only claims against these John Doe defendants are the identical claims regarding the duress alarms and staffing that I have recommended dismissing as against the existing supervisory defendants. *See id*. Based upon my recommendation regarding defendants Langford and Burdo, I would also have recommended dismissal as against the John Doe supervisory defendants. In an abundance of caution, this court will recommend affording plaintiff the opportunity in any objections to this Report-Recommendation to explain why these defendants should not be dismissed.[19]

 **WHEREFORE**, based on the findings above, it is

 **RECOMMENDED**, that the defendants' motion to dismiss or for summary judgment (Dkt. No. 38) be **GRANTED IN PART and DENIED IN PART**, and it is

 **RECOMMENDED**, that defendants' motion to dismiss or for summary judgment (Dkt. No. 38) be **GRANTED** as to defendants **LANGFORD, BURDO, and KING**, and that the complaint be **DISMISSED IN ITS ENTIRETY AS AGAINST THESE DEFENDANTS**, and it is

 **RECOMMENDED**, that the defendants' motion to dismiss or for summary

---

[19] The court must also point out that the claims against the Doe defendants could be barred by the statute of limitations because plaintiff's cause of action accrued in November of 2015, and the statute of limitations for a *Bivens* action is three years from the date of accrual. *Gonzalez v. Hasty*, 802 F.3d at 219-20. "John Doe" pleadings may not be used to circumvent the statute of limitations because replacing the "John Doe" with a named defendant constitutes a change in the party sued. *Cotto v. City of New York*, No. 17-2845, __ F. App'x __, 2020 WL 1228765, at *2 (2d Cir. Mar. 13, 2020) (citations omitted). While there is additional analysis in such cases regarding the "relation back" of claims against a new defendant under Fed. R. Civ. P. 15(c), this court is merely noting that such an issue would exist in this case if John Doe defendants were named at this time.

judgment (Dkt. No. 38) be **GRANTED** as to any claims relating to duress alarms or to staffing, and that these claims be **DISMISSED AS TO ALL DEFENDANTS**, and it is

**RECOMMENDED**, that the defendants' motion to dismiss or for summary judgment (Dkt. No. 38) be **DENIED** with respect to plaintiff's **MEDICAL CARE CLAIM** as against **DEFENDANT CARTER ONLY**, and it is

**ORDERED**, that plaintiff is hereby informed that the complaint may be dismissed as against defendant **Dickson** and the **John Doe** defendants for failure to serve and/or identify, and that plaintiff should notify the court in his objections (if any) to this Report-Recommendation why defendant Dickson and the John Doe defendants should not be dismissed from this action**.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: March 24, 2020

Andrew T. Baxter
U.S. Magistrate Judge